## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BERGEN PLASTIC SURGERY, on behalf of PATIENT JB,<br><br>Plaintiff,<br><br>v.<br><br>HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, CAREFIRST OF MARYLAND, INC., d/b/a CAREFIRST BLUECROSS BLUESHIELD, and CAREFIRST PREFERRED PROVIDER PLAN,<br><br>Defendants. | Case No. |

## **COMPLAINT**

By way of this Complaint, Plaintiff Bergen Plastic Surgery, on behalf of Patient JB ("Plaintiff") brings this action against Horizon Blue Cross Blue Shield of New Jersey ("Horizon"), Carefirst of Maryland, Inc., d/b/a Carefirst BlueCross BlueShield, ("Carefirst") (collectively, the "BCBS Defendants"), and the Carefirst Preferred Provider Plan (the "Plan Defendant") (together, "Defendants").

1.      This is an action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and its governing regulations, concerning Defendants' under-reimbursement to Plaintiff for post-mastectomy breast reconstruction surgical services.

2.      Carefirst was one of the claims administrators of the Plan Defendant, under which the Patient, JB, was the Plan beneficiary.  Horizon was the other claims administrator of the Plan Defendant and an agent of Carefirst under the Blue Card Program or National Accounts System. The Plan Defendant delegated to the claims administrators discretionary authority to process claim

benefits and to make denials on claims that were appealed by claimants, their assignees, or their authorized representatives.

3.      Under the Blue Card Program or National Accounts System, Carefirst was the Home Plan, and Horizon was the Host Plan.

4.      Carefirst made certain appeal denials as a claim administrator for the Plan Defendant. For other appeals Horizon stated that it applied its own payment methodology and denied Plaintiff's appeal of the significant under-reimbursement of claims in this case and imposed out-of-network patient responsibility liability on the Patient, thus making Horizon a claims administrator or, alternatively, the agent of Carefirst.

5.      Patient JB was initially diagnosed with breast cancer.  On May 31, 2018, she underwent a bilateral mastectomy, and immediately following, Tzvi Small, M.D., assisted by Laurel Mengarelli, CRNF, performed the first stage of bilateral breast reconstruction surgery. Prior to the surgery, Plaintiff received pre-authorization from Carefirst under A03838410.

6.      On November 7, 2018, as part of the continuation of care, Dr. Small, again assisted by Ms. Mengarelli, performed the second stage of bilateral breast reconstruction surgery.  Prior to the surgery, Plaintiff received pre-authorization from Carefirst under MRADAMS10242011158.

7.      Dr. Small does not participate in Horizon's network of contracted health care providers.

8.      After each of these breast reconstruction surgeries, Plaintiff submitted invoices in the form of CMS-1500 forms as required to Defendant Horizon for a total amount of $175,750.00. Defendants reimbursed Plaintiff only $7,641.01 leaving an unreimbursed amount of $168,108.00, or 96% of the total amount.

## JURISDICTION

9.     The Court has subject matter jurisdiction over Plaintiff's ERISA claims under 28 U.S.C. § 1331 (federal question jurisdiction).

10.     The Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of this Court, and Defendants systematically and continuously conduct business in the State of New Jersey, and otherwise have minimum contacts with the State of New Jersey sufficient to establish personal jurisdiction over them.

11.     Venue is appropriately laid in this District under 28 U.S.C. § 1391 because (a) Horizon resides, is found, has an agent, and transacts business in the District of New Jersey, (b) Horizon conducts a substantial amount of business in the District of New Jersey, including marketing, advertising and selling insurance products, and insures and administers group healthcare insurance plans both inside and outside the District of New Jersey; (c) Carefirst transacts business in the District of New Jersey through its Host Plan, Horizon, under the Blue Card Program and National Accounts System  and directly by sending appeal letters and other correspondence to its members in the State; and (d) the Carefirst Preferred Provider Plan transacts business in the District of New Jersey by insuring individuals in the State (including the Patient) by providing health insurance to those employees who are plan participants and beneficiaries of its Plan.

12.     Venue is also appropriate under 29 U.S.C. § 1132(e)(2), which requires that an ERISA plan participant has the right to bring suit where she resides or alleges that the violation of ERISA occurred.  Plaintiff alleges that Defendant violated ERISA within the District of New Jersey.

## PARTIES

13.     Plaintiff Bergen Plastic Surgery is a plastic and reconstructive surgery practice group.  Its principal office is in Paramus, New Jersey.

14.     Defendant Horizon Blue Cross Blue Shield of New Jersey is a health care insurance company with offices located in New Jersey and offers Blue Cross Blue Shield-branded health care insurance in the State of New Jersey.  It is one of the claims administrators and/or agent of the claims administrator of Plan Defendant.

15.     Defendant Carefirst offers health insurance to members in Maryland, the District of Columbia and Northern Virginia.  It is one of the claims administrators of the Plan Defendant. Its principal offices are in Baltimore and Washington, D.C.

16.     Defendant Carefirst Preferred Provider Plan is a self-funded ERISA plan, meaning that it is liable for all the claims of its plan participants and beneficiaries. The Plan Administrator is Sodexo, Inc., a French-based international food and facility-based company. Its principal office is in Gaithersburg, Maryland.

## FACTUAL ALLEGATIONS

### A.     The Blue Card and National Accounts Programs

17.     The Blue Card Program and National Accounts System, in which each Blue Cross Blue Shield company must participate, including Defendants Horizon and Carefirst, was the direct result of the practice of all the BCBS companies, under the direction of the Blue Cross Blue Shield Association ("BCBSA"), to engage in exclusive geographical market allocation.  Under this practice, each BCBS company was given a specific geographic market to offer health insurance. This practice continues today.

18.     Horizon's allocated exclusive market is the State of New Jersey.  Accordingly, it cannot offer health insurance or contract with providers in any other state, although it may contract with providers in contiguous counties.

19.     Carefirst's allocated exclusive market is Northern Virginia, the District of Columbia, and the State of Maryland.  It cannot offer health insurance or contract with providers in any adjacent state, although it may contract with providers in contiguous counties.  It cannot offer health insurance in the State of New Jersey.

20.     These restrictions insulate each BCBS Defendant from competition from the other in each of their respective exclusive geographic market areas.  This is why the Sodexo, Inc. account belonged to Defendant Carefirst and not Horizon.  Horizon was prohibited from bidding for this work under BCBSA rules because Sodexo, Inc. is found in Maryland and therefore in Carefirst's exclusive geographic market area.

21.     As part of their mandatory agreement to participate in the Blue Card and National Accounts Programs, the BCBS Defendants commit that other than in contiguous counties they will not contract, solicit or negotiate with providers outside of their allocated geographical market areas. In this case, because the Plan Defendant's beneficiary sought care from a New Jersey-based provider, Carefirst must send the bill to Horizon through the BCBS National Accounts system.

22.     To make this work, the BCBSA created Home and Host Plans.

23.     The Blue Cross Blue Shield insurer in the exclusive geographical area through which the member is enrolled (in this case Carefirst) is the Home Plan. The Blue Cross Blue Shield insurer located in the exclusive geographical area where the service is provided (in this case Horizon) is referred to as the Host Plan.

**B.**      **May 31, 2018, First-Stage Breast Reconstruction**

24.      On May 31, 2018, Patient JB, who suffered from breast cancer, underwent a bilateral mastectomy, and immediately following, the first stage of bilateral breast reconstruction. Tzvi Small, M.D., performed the surgery at The Valley Hospital in Ridgewood, New Jersey, assisted by Laurel Mengarelli, CRNF.

25.      The first-stage of breast reconstruction consisted of the insertion of tissue expanders and acellular dermal matrix. Acellular dermal matrix has become a cornerstone of implant-based immediate breast reconstruction.

26.      This surgery was performed immediately following the bilateral mastectomy.  This meant that the patient would undergo a bilateral mastectomy performed by one surgeon specializing in oncology, and then another surgeon who specialized in breast reconstruction would perform the first stage of bilateral breast reconstruction. Both surgeries would be performed on the same day, back to back, and the patient would be in the same operating room and under the same anesthesia.

27.      Breast reconstruction is a complex surgery.  It involves the placement of a tissue expander in flaps that will become the reconstructed breasts.  The tissue expander expands the skin and allows the subsequent placement of the breast implant.

28.      After performing this first-stage breast reconstruction surgery, Plaintiff submitted an invoice on a CMS-1500 form to Horizon, as required, for $63,000.00, representing Dr. Small's bills as the primary surgeon.  The billed amounts, paid amounts, and CPT codes were as follows:

| CPT | Billed Amount | Paid Amount |
|-----|---------------|-------------|
| 19357-50 | $52,000.00 | $1,772.81 (deductible $1,093.65) |
| 15777-50, 59 | $11,000.00 | $326.24 |
| **Total** | **$63,000.00** | **$2,099.05** |

6

CPT 19357 is breast reconstruction. CPT 15777 are flaps and grafts procedures. This is an add-on code to CPT code 19357.  Modifier -50 means a bilateral procedure.

29.     Plaintiff submitted an invoice on a CMS-1500 form to Horizon, as required, for $15,750.00, representing Ms. Mengarelli's bills as the assistant.   The billed amounts, paid amounts, and CPT codes were as follows:

| CPT | Billed Amount | Paid Amount |
|-----|---------------|-------------|
| 19357-AS 50 | $13,000.00 | $742.28 |
| 15777-AS50, 59 | $2,750.00 | $104.40 |
| **Total** | **$15,750.00** | **$846.68** |

30.     Plaintiff filed an appeal concerning the amount of Defendants' reimbursement of Plaintiff's bill for Dr. Small on January 16, 2019.

31.     Defendant Carefirst denied this appeal on March 20, 2019, on the grounds that since Plaintiff was out-of-network it was owed the "Maximum Reimbursable Charge."

32.     Defendant Carefirst defined the "Maximum Reimbursable Charge" as follows:

The maximum reimbursable charge is the maximum amount CareFirst will pay for out-of-network claims.  The maximum reimbursable charge for covered services is determined based on the lesser of:

• The provider's normal charge for a similar service or supply, or

• A percentage of a schedule based on a methodology like the methodology used by Medicare.

33.     The Plan has one level of appeal.  Plaintiff exhausted Patient JB's administrative remedies.

34.     Nonetheless, Plaintiff sent another appeal on March 14, 2019.

35.     Defendant Horizon treated the appeal as a grievance on April 4, 2019 and processed it according to "Horizon BCBSNJ's payment methodology."

36.     By basing its determination on Horizon's payment methodology, Horizon acted as the claims administrator for the Plan Defendant.

37.     By requiring CMS-1500 billing forms to be sent to Horizon, Horizon acted as the agent of Carefirst.

### C.     November 7, 2018, Second-Stage Breast Reconstruction

38.     On November 7, 2018, Dr. Small, assisted by Ms. Mengarelli, performed the second-stage breast reconstruction on Patient JB, shaping the breasts with fat grafting, removing the tissue expanders, and inserting permanent breast implants.

39.     Plaintiff submitted an invoice on a CMS-1500 form to Horizon, as required, for $77,600.00 representing Dr. Small's bills as the primary surgeon.  The billed amounts, paid amounts, and CPT codes were as follows:

| CPT | Billed Amount | Paid Amount |
| --- | --- | --- |
| 19342-50,59 | $31,000.00 | $2,820.30 |
| 19371-50 | $27,000.00 | $1,198.32 |
| 15770-59 | $19,600.00 | $676.66 |
| **Total** | **$77,600.00** | **$4,695.28** |

CPT codes 19342 and 19371 are breast reconstruction.  CPT code 15770 is flap and graft procedures.  The modifier -59 means a distinct procedure that should be independently reimbursed.

40.     Plaintiff submitted an invoice on a CMS-1500 form to Horizon, as required, for $19,400.00 representing Ms. Mengarelli's bill as the assistant.  The billed amounts, paid amounts, and CPT codes were as follows:

| CPT | Billed Amount | Paid Amount |
| --- | --- | --- |
| 19342-AS,50 | $7,750.00 | $0 |
| 19371-AS,50,59 | $6,750.00 | $0 |

| 15770-AS,59 | $4,900.00 | $0 |
|---|---|---|
| **Total** | **$19,400.00** | **$0** |

41.     Defendants refused to pay certain of the amounts billed for the surgical assistant, claiming that the Plan did not cover assistants.  This statement was untrue.  The Plan terms explicitly provide coverage for surgical assistants. The SPD states, under the heading, "Inpatient Physician," and the column "Out-of-Network": "After deductible, Plan pays 50% of MRC; includes radiologists, pathologist, anesthesiologist and surgical assistant."  By breaching the terms of the SPD, Defendants violated ERISA. In addition, CPT code 15770 recognizes a surgical assistant, as does CPT code 19342.

42.     Plaintiff filed an appeal concerning Dr. Small's bill on April 11, 2019.  Defendants failed to respond. Lack of response evidences exhaustion futility under ERISA.

43.     Plaintiff filed an appeal concerning Ms. Mengarelli's bill on April 11, 2019. Defendants failed to respond, evidencing exhaustion futility.

44.     Breast reconstruction was a covered service under the Defendant Plan's Summary Plan Description ("SPD").  It is a federal mandate under the Women's Health and Cancer Rights Act ("WHCRA").  The language of the WHCRA must be incorporated into all SPDs and Certificates of Insurance and was, in the case of the SPD in this case.

45.     The SPD states: "The Women's Health and Cancer Rights Act requires those health plans that have coverage for mastectomies to also provide coverage for reconstructive surgery and prostheses following mastectomies."

46.      Plaintiff received an Assignment of Benefits from Patient JB.  The Assignment stated, in pertinent part:

> I hereby assign and convey to the fullest extent permitted by law and all benefit and non-benefit rights (including the right to any payments) under my health insurance policy or benefit plan to Dr. Tzvi Small and Tzvi Small, MD (collectively, the

"Providers") with respect to any and all medical/facility services provided by the Providers to me for all dates of service. It is specifically intended by this assignment of benefits to assign to the fullest extent permitted by law any and all of my rights, including without limitation, the right of one or more of my Providers . . . (iv) to bring any appeal, lawsuit, or administrative proceeding, for and on my behalf, in my name against any person and/or entity involved in the determination of benefits under any insurance policy or benefit plan.

47.     Plaintiff received a Designation of Authorized Representative from Patient JB.  It stated, in relevant part:

I hereby appoint as a Designated Authorized Representative each of my Providers and . . . lawyers (including the Law Offices of Cohen and Howard) . . . [including the] right of my Authorized Representative to pursue . . . litigation or otherwise under any Federal or State law with respect to payment for services provided by a Provider to me, including penalties, interest, and attorney fees.

48.     ERISA allows a Designated Authorized Representative to bring litigation on behalf of a Plan Participant or Beneficiary of an ERISA Plan.

### D. Full Coverage and Reimbursement of Breast Reconstruction Surgery under the Women's Health and Cancer Rights Act

49.     Breast reconstruction is a federal mandate under the WHCRA, enacted in 1998, which requires group health plans to cover breast reconstruction after a mastectomy.  This law, codified at 29 U.S.C. § 1185b, states:

(a) **In general.** A group health plan . . . shall provide, in case of a participant or beneficiary who is receiving benefits in connection with a mastectomy and who elects breast reconstruction in connection with such mastectomy, coverage for –

(1) all stages of reconstruction of the breast on which mastectomy has been performed . . . in a manner determined in consultation with the attending physician and the patient.  Such coverage may be subject to annual deductibles and coinsurance provisions as may be deemed appropriate and as are consistent with those established for other benefits under the plan or coverage . . .

(c)     **Prohibitions.** A group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not –

(2)     penalize or otherwise reduce or limit the reimbursement of an attending provider,

(d)    **Rule of construction.** Nothing in this section shall be construed to prevent a group health plan or a health insurance issuer offering group health insurance coverage from negotiating the level and type of reimbursement with a provider for care provided in accordance with this section.

50.    The structure of this statute is straightforward.  29 U.S.C. § 1185b(a) requires that post-mastectomy breast reconstruction surgery be *covered*. 29 U.S.C. § 1185b(c) prohibits any restrictions or limitations on the *reimbursement rate* for this type of surgery, whether performed by an in-network surgeon or an out-of-network surgeon, as compared to other types of surgery where a plan or insurer may reimburse based on an out-of-network reimbursement methodology (such as "MRC").  However, 29 U.S.C. § 1185b(d), provides an exception to the strict requirement of 29 U.S.C. § 1185b(c): the plan or insurer may negotiate a lower reimbursement amount with the provider.

51.    In this case, Defendants could have, but failed to, negotiate with and execute an agreement with Plaintiff to pay a lower amount.  Instead, they unilaterally reimbursed Plaintiff based on their out-of-network methodology, in violation of the WHCRA.  This statute was incorporated into the Plan, as required under 29 U.S.C. § 1185b(b).  Defendants' failure to reimburse Plaintiff pursuant to the WHCRA was a violation of ERISA, 29 U.S.C. § 1132(a)(1)(b).

52.    The WHCRA was enacted in October 21, 1998, not only because of horror stories of "drive-through mastectomies" where women were forced into four-hour out-patient mastectomy surgeries by their insurance companies to save money, but because of denials of coverage for breast reconstructions on the basis that such reconstructions were cosmetic.  As Senator Snowe stated in committee:

> We have also found that breast reconstructive surgery is considered cosmetic surgery.  Well, it is not.  Forty-three percent of women who want to undergo breast reconstructive surgery cannot because it is deemed cosmetic.  And that is wrong. Breast reconstructive surgery is designed to restore a woman's wholeness.

144 Cong. Rec. § 4644 at *4648 (May 12, 1998).

53.     Accordingly, breast reconstruction was a covered service under Patient JB's Plan.

54.     Notwithstanding this federal mandate, upon information and belief Horizon did not have any provider in its network with admitting privileges at The Valley Hospital who was qualified to perform the two-stage breast reconstruction surgery that Patient JB required and received.  There was no in-network provider in the hospital who could have performed the first-stage breast reconstruction on the same day as the bilateral mastectomy, so that Patient JB did not have to undergo two separate surgeries under new anesthesia – with all the accompanying risks of infection, complications, and the psychological impact of the delay in reconstruction.

55.     Dr. Small worked as a team with Patient JB's surgical oncologist to ensure that the first stage of the Patient's breast reconstruction could begin immediately after the mastectomy was completed, and while the Patient was still under anesthesia. This way, the Patient did not have to be administered anesthesia twice, which reduced the risk of serious side effects, and eliminated the possibly devastating psychological effects of waiting weeks or months for breast reconstruction surgery upon being discharged from the hospital after a mastectomy.

56.     Defendant Horizon provided three names of purported in-network breast reconstruction surgeons within 40 miles of Patient JB's home.  The first one was not in-network. The other two did not have admitting privileges at The Valley Hospital, such that Patient JB would have been forced either to (1) put off her bilateral mastectomy (while letting her breast cancer continue to grow) while she found a new in-network hospital in which one of the other two surgeons (whom she did not know) had admitting privileges and a new in-network surgeon for her mastectomy; or (2) had the bilateral mastectomy at The Valley Hospital but not the immediate first-stage breast reconstruction and again found a new in-network hospital in which one of the other two surgeons had admitting privileges and then attempt to schedule her subsequent breast

reconstruction surgery. This would mean, however, that she would be at risk of an additional round of anesthesia, and an additional and separate visit to the operating room, involving surgical and post-surgical infections just for the first-stage breast reconstruction.  *After that*, she could only hope that one of the two surgeons she chose would be available to perform the second-stage breast reconstruction surgery in a few months and, if any additional surgery after that was necessary (for example, to provide breast symmetry, a common procedure after the second-stage breast reconstruction surgery), they would be available in the future. If one of these two surgeons were unavailable, she would have had to start all over again or, because there were only two in-network surgeons, either travel more than 40 miles one way (or to a different state) for each surgery, or forego treatment altogether and live with asymmetrical breasts despite the federal mandate for post-mastectomy breast reconstruction.

57.     Dr. Small is Assistant Professor of Plastic Surgery at the Albert Einstein College of Medicine.  He is double-Board-certified in Plastic and General Surgery. He obtained his medical degree from the NYU School of Medicine and continued his residency in general surgery at Beth Israel Medical Center where he served as Chief Resident.  He then was granted a fellowship in Plastic and Reconstructive Surgery at the Albert Einstein College of Medicine.

58.     Defendants' decision to assess the patient $168,108.00, in out-of-pocket costs for breast reconstruction surgeries that must be covered and reimbursed is not a coverage decision.  It is, instead, a decision forcing Patient JB to self-insure her own breast reconstruction surgeries, in violation of the WHCRA.  This is the kind of medical reimbursement determination that frequently triggers medical bankruptcies.

### E.     Breast Reconstruction under New Jersey Law

59.     It is also in violation of New Jersey law.  On May 3, 2013, the Commissioner of New Jersey's Department of Banking and Insurance ("DOBI") issued Bulletin 13-10 based on

New Jersey statutes, noting that "It has come to the Department's attention that there have been recurring instances of the inability of patients to obtain in-network benefits for the services of non-network surgeons performing breast reconstruction as part of the surgical procedure in which a mastectomy is performed.  In some cases, carriers have been declining patient requests to use out-of-network surgeons, asserting the availability of in-network surgeons.  However, the in-network surgeons frequently do not perform, or are not qualified to perform, the particular type of requested reconstructive surgery."

60.     In this case, Defendants did not decline Patient JB's request to have Dr. Small perform her breast reconstruction surgery.  Rather, knowing that there was no in-network provider with admitting privileges in the patient's hospital who could perform this surgery, Defendants paid Plaintiff the out-of-network rate, which forced Patient JB to self-insure her own breast reconstruction surgery.

61.     The DOBI Commissioner continued: "In other cases, in-network oncological surgeons may be practicing as part of a team which includes out-of-network reconstructive surgeons who could participate at the same surgical session in which the mastectomy is performed, thus avoiding the need for the covered person to undergo a separate institutionalization and surgery for the breast reconstruction."

62.     That is precisely what occurred with Patient JB.

63.     The DOBI Commissioner concluded that when an insurer in New Jersey did not have a breast reconstruction surgeon in its network, it should approve the use of an out-of-network specialist but ensure that its member receives this service at the in-network co-pay amount. This requirement ensures that a cancer patient under New Jersey law and with coverage under the WHCRA, as here, does not face ruinous balance bills simply by choosing an out-of-network specialist.

14

64.     Defendants violated this law. Defendants should have ensured that Patient JB received her breast reconstruction surgery at the in-network level of patient responsibility.  Instead, Patient JB was charged out-of-network-level co-pays.

### F.     Full and Fair Review under ERISA

65.     29 C.F.R. § 2560.503-1(g) provides as follows:

**Manner and content of notification of benefit determination.**

(1) The plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b-1(c)(1)(i), (iii), and (iv). The notification shall set forth, in a manner calculated to be understood by the claimant -

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v) In the case of an adverse benefit determination by a group health plan -

(A) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.

66.     Defendants did not provide the information required by 29 C.F.R. § 2560.503-1(g), in violation of ERISA and the rules promulgated thereunder. Defendants did not provide full and fair review to Plaintiff.

67.     In its appeal denial letter, Carefirst stated that its under-reimbursement was based on a "percentage of a schedule based on a methodology like the methodology used by Medicare." It did not disclose what percentage, what "schedule," or what "methodology like the methodology." It did not state that a copy of such rules and methodologies would be provided free upon request.

68.     In its denial letter to Plaintiff's appeal, Horizon stated that the same under-reimbursement was based on "Horizon BCBSNJ's payment methodology," but failed to disclose what that methodology was. Horizon also failed to state that a copy of this methodology would be provided free upon request. Horizon did not disclose whether its methodology differed from Carefirst's methodology, although both BCBS Defendants represented that their methodologies were utilized to make the reimbursement determinations in this case.

69.     Under ERISA, when an insurer or claims administrator fails to follow the procedures set out in the Plan, as here, the claimant is deemed to have exhausted her administrative remedies.

70.     Deemed exhaustion is set out in 29 C.F.R. § 2560-503-1, which states:

[I]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

### G.    The Fiduciary Duties of the Plan Defendant

71.     The Plan Defendant is a fiduciary, and under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104 (a)(1)(B) it must discharge its duties solely in the interest of Plan participants and beneficiaries like Patient JB. It cannot permit its claims administrators to make claims determinations that would violate the terms of its SPD.

16

72.     In this case, the Plan Defendant breached its fiduciary duties under ERISA by permitting the BCBS Defendants to make coverage decisions for breast reconstruction for Patient JB, a beneficiary of the Plan, in violation of the Plan's SPD which covered breast reconstruction in accordance with the WHCRA.

## COUNT I

### CLAIM AGAINST DEFENDANT HORIZON FOR UNPAID BENEFITS
### UNDER EMPLOYEE BENEFIT PLAN GOVERNED BY ERISA

73.     Defendant Horizon is obligated to pay benefits to the Defendant Plan participants and beneficiaries in accordance with the terms of the Defendant Plan's SPD, and in accordance with ERISA.  This obligation arises under the Blue Card Program and National Accounts System, and under ERISA.

74.     Defendant Horizon violated its legal obligations under this ERISA-governed Plan when it, together with Defendant Carefirst, under-reimbursed Plaintiff for breast reconstruction surgeries provided to Patient JB by Plaintiff, in violation of the terms of the SPD and in violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

75.     Plaintiff submitted invoices to Defendant Horizon for $175,750.00.

76.     Defendant Horizon together with Defendant Carefirst determined that the Paid Amount was $7,641.01, leaving an under-reimbursed amount of $168,108.00.  Defendant thereby reimbursed 4% of the total amount.

77.     Defendant Horizon acted by itself in making denials and stating that it utilized its own payment methodology and acted as Carefirst's agent under the Blue Card Program and National Accounts System.

78.     Plaintiff seeks unpaid benefits and statutory interest back to the date Plaintiff's claims were originally submitted to Defendant Horizon. It also seeks attorneys' fees, costs, prejudgment interest and other appropriate relief against Defendant Horizon.

## COUNT II

### CLAIM AGAINST DEFENDANT CAREFIRST FOR UNPAID BENEFITS UNDER EMPLOYEE BENEFIT PLAN GOVERNED BY ERISA

79.     Defendant Carefirst is obligated to pay benefits to the Defendant Plan participants and beneficiaries in accordance with the terms of the Defendant Plan's SPD, and in accordance with ERISA.  This obligation arises under the Blue Card Program and National Accounts System, and under ERISA.

80.     Defendant Carefirst violated its legal obligations under the Plan when it, together with Horizon, under-reimbursed Plaintiff for breast reconstruction surgeries provided to Patient JB by Plaintiff, in violation of the terms of the SPD and in violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

81.     Defendant Carefirst together with Defendant Horizon determined that the Paid Amount was $7,641.01, leaving an under-reimbursed amount of $168,108.00.  Defendant thereby reimbursed 4% of the total amount.

82.     Plaintiff seeks unpaid benefits and statutory interest back to the date Plaintiff's claims were originally submitted to Defendant Carefirst. It also seeks attorneys' fees, costs, prejudgment interest and other appropriate relief against Defendant Carefirst.

## COUNT III

### CLAIM AGAINST CAREFIRST PREFERRED PROVIDER PLAN FOR VIOLATION OF ERISA 404 § (A)(1)(B)

83.   The Plan Defendant is a fiduciary, and under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104 (a)(1)(B), it must discharge its duties solely in the interest of Plan participants and Beneficiaries.

84.   The Plan Defendant must act prudently with the care, skill, prudence and diligence that a prudent fiduciary would use, and must ensure that it is acting in accordance with Plan documents, such as its SPD.

85.   An ERISA fiduciary cannot fully delegate its fiduciary responsibilities to another entity.  For example, the Plan Defendant cannot fully delegate its fiduciary responsibilities to administer claims to a claims administer and be free of its fiduciary responsibilities under ERISA.

86.   As a fiduciary, the Plan Defendant owed Patient JB and therefore Plaintiff a duty of loyalty and the avoidance of self-dealing.  It cannot permit its claims administrator to make claims determinations that would violate the terms of its SPD.

87.   The Plan Defendant breached its duty of loyalty and violated the fiduciary responsibilities it owed Patient JB and therefore Plaintiff by failing to ensure that its claims administrators were reimbursing Plaintiff according to the Plan Defendant's SPD, which incorporated the WHCRA.  Instead, United under-reimbursed Plaintiff for two surgeries.  These two surgeries were covered under the terms of the SPD.

88.   The Plan Defendant failed to monitor and correct the BCBS Defendants' misconduct, despite the Plan Defendant's continuing fiduciary duty to do so.

89.     As a self-funded Plan, the Plan Defendant saved the under-reimbursed amount by allowing its claims administrators to pay Plaintiff in breach of the Plan's SPD, in violation of the Plan Defendant's own fiduciary duties, and in violation of ERISA.

90.     Plaintiff seeks relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), which includes declaratory relief, surcharge, profits, and removal of a fiduciary that breached its duties.

**WHEREFORE**, Plaintiff demands judgment in its favor against Defendants as follows:

(a)     Ordering the Court to recalculate and issue unpaid benefits to Plaintiff;

(b)     Ordering declaratory relief, surcharge, profits, and removal of the Plan Defendant for breach of its fiduciary duty and loyalty;

(c)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees under ERISA, and costs and expenses in amounts to be determined by the Court;

(d)     Awarding prejudgment interest; and

(e)      Granting such other and further relief as is just and proper.

Dated: March 11, 2020

/s/ Michael F. Fried
AXELROD LLP
354 North Fourth Avenue
Highland Park, NJ 08904
(732) 718-6171
mfried@axelrodllp.com

Robert J. Axelrod
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
(646) 448-5263
rjaxelrod@axelrodllp.com

Leslie S. Howard
COHEN HOWARD LLP
766 Shrewsbury Avenue, Suite 200
Tinton Falls, NJ 07724
(732) 747-5202
lhoward@cohenhoward.com

Attorneys for Plaintiff Bergen Plastic
Surgery, on behalf of Patient JB